WARREN *v.* STATE OF INDIANA.

[No. 26,161.   Filed July 2, 1935.]

*Ernest J. Crenshaw, Nat H. Youngblood,* and *Edwin C. Henning,* for appellant.

*James M. Ogden,* Attorney-General, *Harry Taylor* and *Robert L. Bailey,* Assistant Attorneys-General, for appellee.

TREANOR, C. J.—Appellant, a member of the board of commissioners of Vanderburgh county, was convicted upon an indictment charging him and five co-defendants with conspiracy to present a claim to the board of commissioners of Vanderburgh county for certain electrical work which was to be required by a written construction contract to be entered into, and which claim was to be false in certain particulars. Under Propositions, Points and Authorities, and in Argument, appellant pre-

sents only the third error assigned,—that "The Vanderburgh Circuit Court erred in overruling the appellant's motion for new trial." Of the 37 grounds in the motion for new trial, the following are presented upon appeal:

1. That the verdict of the jury is not sustained by the evidence.

2. That the court erred in giving instructions Nos. 1, 2 and 3 upon its own motion, in giving instructions Nos. 2, 4, 5, 6 and 7 at the request of the state and in refusing to give instructions Nos. 1 and 10 requested by the appellant.

3. That the court erred in admitting in evidence state's exhibits Nos. 20 and 36.

4. That the verdict is contrary to law.

The giving of instruction number one by the court was error. After stating the statutory duty of any "architect, engineer, or superintendent" respecting a filing of a certificate, the instruction continued:

"Said certificate must be filed with the clerk, but the same shall not be conclusive and it is declared to be the duty of said Commissioners. to inform themselves as to whether such money is due and owing under the contract. before allowing said claim. No warrants shall be drawn and no funds shall be paid out of the county treasury in payment of any such claim on any contract with the Commissioners for the execution of any public undertaking, except such contract has been let pursuant to the provisions of this act, nor unless said claim has been filed and allowed by the Commissioners in the manner herein required.

"If you find from the evidence in this case that the Althoff-Howard Electric Company filed any claim for compensation under a contract with the Board of Commissioners of the County of Vanderburgh, Indiana, even though that claim was certified as correct by the architect employed by the

county to supervise the work contemplated under said contract, it was the duty of the defendant, Allan P. Warren, as a member of the Board of Commissioners of the County of Vanderburgh, Indiana, before voting to allow said claim to inform himself as to whether the amount of money so claimed was due and owing under said contract.

"If you find from the evidence in this case that the defendant failed to so inform himself before voting for the allowance of said claim then said fact may be considered by you along with the other evidence in this case in determining your verdict."

The jury must have understood that "to inform himself as to whether the amount of money so claimed was due and owing" meant to know as a fact that the amount was, or was not, due and owing under the contract. Consequently, if the jury should find that the amount claimed was not in fact owing, it would follow that the defendant had failed *to inform himself;* and under the instruction the jury was at liberty to draw an inference unfavorable to the defendant from this failure. While the statute places upon a county commissioner the duty of informing himself as to whether the amount of a claim is due and owing there is nothing in the statute to suggest that a county commissioner who has used reasonable diligence to inform himself is guilty of breach of duty, even though he fail to discover that a claim is false. "To inform himself" should be construed to mean to obtain information bearing on the correctness of the claim. Obviously there cannot be a requirement of law that a county commissioner must "inform himself" in the sense that he must acquire actual personal knowledge, independently of the opinion of the expert, as to whether a public work has been completed according to contract specifications. Boards of county commissioners are authorized to employ experts upon the assumption that commissioners do not have suffi-

cient technical knowledge to determine whether public works have been properly constructed. Frequently the only dependable source of information as to whether the amount of money claimed is due and owing will be the judgment of the architect or engineer. The obvious intent of the statute, which is relied upon in the instruction, is, first, to prevent the board of commissioners from being bound, as a matter of law, by the certificate of their agent, and, second, to place upon the board of commissioners the ultimate responsibility for allowance of claims. If a county commissioner makes a good faith effort to inform himself of the correctness of a claim by consulting the expert in charge and by making the sort of inspections and investigations, which men without technical knowledge normally would be expected to make, his failure to discover that a claim is, in fact, not due and owing cannot be made the basis of an inference of criminal intent of any character. And if the determination of the validity of a claim requires technical knowledge then a county commissioner clearly should not be expected to follow his own non-expert judgment as against the judgment of an architect or engineer in charge of public work.

It follows from the foregoing that the jury was not free to draw an unfavorable inference from defendant's failure (if there was a failure) to acquire personal knowledge that the amount of the claim was in fact due and owing, before voting for the allowance of the claim. The only proper basis for an unfavorable inference would have been defendant's failure to use the degree of diligence required by the circumstances to satisfy himself of the correctness of the claim.

The instruction was especially dangerous in view of the allegations of the indictment and the evidence which was relied upon to support the allegations. The alleged

offense was a conspiracy to cause a false claim to be filed, which was to be false in respect to a certain main safety service switch and eighteen "electric outlets." There was no direct evidence of a conspiracy and the state relied largely upon the alleged failure of the contractor to furnish and install the main service safety switch and to furnish labor and materials for the eighteen "electric outlets." The specifications did not provide for the eighteen "electric outlets" in the court rooms and a careful reading of the evidence and examination of all references to "outlets" in exhibits induces a confident belief that a non-expert could not have known that the contractor was obligated to furnish and install nine outlets in each of the two court rooms. It was clearly a question for the expert judgment of the architect and the defendant was justified in relying upon his advice. The defendant testified that the architect advised him that no work was to be done in the court rooms. If the evidence was sufficient to convince the jury that the contractor was obligated to furnish the eighteen "electric outlets" the jury must have found that the amount of the claim was not due and owing under the contract. But the jury was not justified in drawing an unfavorable inference against the defendant from his failure to learn that the amount claimed was false if he acted in good faith in relying upon the advice of the architect. Yet under instruction number one the jury was free to draw an unfavorable inference from defendant's failure to know that the amount claimed was not due and owing, even though the defendant relied in good faith upon the architect's opinion.

The instruction was prejudicial to the defendant's interests also by reason of the relation to the state's case of the allegation and evidence respecting the "four hundred (400) ampere, two (2) pole, two hundred fifty

(250) volt, main fused safety service switch." As already stated the indictment contained allegations that the claim was to include a charge for the main fused safety service switch and that the defendant and his alleged co-conspirators had agreed that the switch should not be furnished and installed. The dangerous effect of the instruction will be understood from the following discussion.

The main contract out of which this prosecution arose was executed by Althoff-Howard Company and the board of county commissioners on September 20, 1929; the final claim for services thereunder was filed April 25, 1930, and was allowed May 1, 1930. The contract contained the following provision respecting a service switch:

"Main Lighting Service. The electrical contractor's work shall start at a 400 ampere, 2 pole, 250 volt main fused safety service switch furnished by him and from the same run three No. 300,000 C. M. R. C. cables in 3 inch conduit to a meter cabinet and thence to a main lighting service distribution cabinet, both to be mounted adjacent to service switch."

A supplemental contract for emergency service connection was entered into between the board of commissioners and Althoff-Howard on May 26, 1930. The latter contract contained the following clause:

"Furnishing and installing 3 No. 500 C. M. R. C. stranded cables in a 3 inch conduit from a new 400 ampere, 2 pole, 250 volt main fused safety service switch adjacent to new lighting distribution panel and cabinet and extend same over to and connect to present lighting service where the same enters the building, providing a new service switch at this point if required."

It is at once apparent that this clause presupposes the existence of "a main fused safety service switch" which was required to be installed by the terms of the first

contract. The clause quoted from the second contract requires only the furnishing and installing of cables to connect the "main fused safety service switch" to the "present lighting service where the same enters the building." There is an agreement to furnish "a new service switch" at the point where the present lighting service enters the building if such new service switch is required; but this is obviously contingent and to be determined during the progress of the work under the second contract, which was not executed until after the first contract presumably had been completed. It is clear that the first contract, which is the only one involved in the alleged conspiracy, called for only one "400 ampere, 2 pole, 250 volt main fused safety service switch." It is also clear that the second contract only contingently calls for "a new service switch" which is not described.

The foregoing provisions are especially important since the state emphasizes the alleged failure of the contractor to furnish and install the main fused safety service switch. Obviously the most striking proof that the defendant knew of the falsity of the claim would have been furnished by evidence that such an important and easily observed item as the "400 ampere, 2 pole, 250 volt main fused safety service switch" had not been furnished; and that defendant as county commissioner had approved the claim.

An examination of the record discloses that the state's case presupposed that Althoff-Howard was required by the two contracts to furnish two "400 ampere, 2 pole, 250 volt main fused safety service" switches; and that by the terms of the first contract one was to be adjacent to a meter cabinet and a service distribution cabinet and by the terms of the second contract one was to be at the point where the lighting *service enters the*

*building.* There is no dispute that only one "400 ampere, 2 pole, 250 volt main fused safety service switch" was furnished and installed and that sometime prior to the spring of 1931 this switch had been placed near the point where the lighting service enters upon the building. The state assumed, and presented evidence to support the assumption, that the main fused safety service switch which was furnished and installed was furnished and installed under the terms of the supplemental contract and, consequently, that no main fused safety service switch was furnished under the first contract. If that was true then the claim filed under the main contract was in fact false, insofar as it included the switch in question.

But, as pointed out above, the supplemental contract did not obligate Althoff-Howard to furnish a "400 ampere, 2 pole, 250 volt safety service switch." There was no obligation to furnish any switch under the terms of the supplemental contract unless it should be determined that a switch of some type was required. The state did not introduce any evidence tending to show that the architect or anyone else ever determined that any switch of any type should be furnished and installed under the terms of the second contract. Nor is there any showing that a second switch was in fact required. Consequently there was no basis for a rational inference that the "400 ampere, 2 pole, 250 volt main fused safety service switch" was furnished under the second contract.

The chief technical witnesses for the state were two expert electricians who had made personal examinations of the electrical equipment. The examinations were made a year after the completion of the first contract and after the filing of the allegedly false claims by Althoff-Howard. They were permitted to testify as to

what they found; and also to state their conclusions as to whether the specifications had been followed; and also to give their construction of various clauses in the specifications in the first and second contracts. As indicative of the state's misunderstanding of the contracts we quote the following testimony of witness Mack Howe:

"A. According to paragraph four of the general specifications (*supra,* p. 532) calling for a 400 ampere, 2 pole, 250 volt main safety service switch, and three 500,000 C. M. R. cables in a three inch conduit from the switch to the meter cabinet and thence to the main distribution cabinet, I found that this work was also covered by *specifications* entitled Electric Service for Courthouse" in paragraph six (*supra,* p. 532) . . ." (Our italics.)

The witness treated the provisions of paragraph six as including specifications for a "400 ampere, 2 pole, 250 volt main fused safety service switch." But the reference to the "400 ampere" switch is not a specification for such a switch, but merely refers to the switch to locate the starting point for the cables specified in paragraph six. This is perfectly clear when we keep in mind that the contract containing paragraph six was executed a month after the first contract had been completed and the claim filed. In the following testimony the witness apparently recognized that paragraph six merely referred to the "400 ampere" switch as a starting point, but testified unqualifiedly that such switch was not installed:

"Now paragraph six of the specifications for electric service calls for three number 500 C. M. rubber covered cables in a three inch conduit from a new 400 ampere, 3 pole, 250 volt, fused safety service switch adjacent to a new distribution cabinet to present lighting service where the same enters building. The new 400 ampere safety service switch was not installed and all this work is covered in general specifications, paragraph 4."

During cross-examination of witness Howe he testified that there was a "400 ampere" switch, but that it was not "adjacent to this equipment on the same board." Then the following testimony was given:

"Q. Are you intending to tell this jury that there should be two 400 ampere, 2 (3) pole, 250 volt main fused safety switches on this job?

"A. To satisfy both sets of specifications, yes sir.

"Q. That's your construction of it?

"A. That's what they call for.

"Q. I'm not talking about what they call for, that is your construction of it, isn't it?

"A. Yes, sir."

Another technical witness, Mr. Charles Harding, had investigated the electrical wiring system at the request of the prosecuting attorney and had checked it against the specifications. The following is quoted from his direct examination:

"A. The general specifications in paragraph four, the work specified called for a 400 ampere main safety switch with 3 No. 500,000 C. M. R. C. cables in a three inch conduit from the switch to meter cabinet and thence to main lighting service distribution cabinet. That work was covered by the specifications entitled 'Electric Service for the Courthouse,' paragraph six, and that was left out. (Our italics.)

"Q. Found only one such switch in the whole building?

"A. One switch on the wall in the record room."

The foregoing testimony of the state's two special, expert investigators reveals clearly that they understood the specifications to call for two "400 ampere, 2 pole, 250 volt main fused safety service" switches. They both found one "400 ampere, 2 pole, 250 volt main fused safety service switch" and both concluded that the one which had been omitted was the one provided for by paragraph four (4) of the general contract. If both

experts had not been laboring under the mistaken idea that two "400 ampere," etc., switches were required by the specifications they naturally would have concluded that the switch called for by paragraph four of the first contract had been furnished, but that the contractor had deviated from the specifications. This conclusion would have been inevitable since the unit consisting of the 400 ampere switch, the meter cabinet and the distribution cabinet were installed and connected exactly as required by paragraph four, except that the switch, instead of being upon the same panel with the meter-and-distribution cabinets, as was probably contemplated, was placed in an adjoining room a short distance from the point where the lighting service enters the building. The expert investigators having misconstrued paragraph six of the supplemental contract for the connection of electrical service to require a second "400 ampere," etc., switch to be supplied and installed near the point where the lighting service entered the building naturally assumed that the "400 ampere," etc., switch which they found at that point, a year after the claim was filed, was the one which they thought was required by the supplemental contract.

This assumption that the contractor was obligated to furnish and install two switches is carried into the brief of the Attorney-General. We quote: "The original contract called for the installation of a '400 ampere, 2 pole, 250 volt, main fused safety service switch; and the contract for electric lighting service for the courthouse *calls for a similar switch*. The testimony established that *only* one such switch was used'"; (our italics) and as indicating further confusion the Attorney-General's brief states that "the switch found was not a fused type." A state's witness had testified that a "300 ampere main fused safety service switch in a six circuit

lighting panel and cabinet to be installed on the first floor" was not a "fused type of switch." This switch was not the "400 ampere, 2 pole, 250 volt main fused safety service switch" which is involved in the alleged conspiracy. Nobody testified that the latter switch did not in its construction exactly conform to the specifications. The switch which was found not to be a "fused type" was furnished and installed under a third contract which was entered into between Althoff-Howard and the Vanderburgh county commissioners on August 4, 1930, almost a year after the execution of the main wiring contract.

As indicated above the evidence of the state respecting the "400 ampere" switch referred only to a time approximately a year after the claim had been filed. State's witnesses who were questioned admitted that they had no knowledge whether a "400 ampere," etc., switch had been installed prior to April 25, 1930 (the date the claim was filed) either adjacent to the meter-and-distribution cabinets or at the point where they saw it in the spring of 1931. The one state's witness who apparently should have had most definite information was not questioned by the state upon that point. We refer to William Mullery who was Althoff-Howard's supervising engineer in charge of the installation of the electric wiring system in the courthouse; who had been indicted as a co-conspirator of appellant; and who had been brought back from California as a state's witness under a promise of leniency.

The defense introduced the testimony of Harry Doerr, Althoff-Howard's foreman, to the effect that the "400 ampere, 2 pole, 250 volt main fused safety service switch" had been installed prior to the 24th day of April, 1930, and was installed on the "board" or panel adjacent to the meter and distribution cabinets; and

that the switch was later "placed in an adjoining room where the service enters the building."

The local manager of the General Electric Supply Company testified that his company furnished the "400 ampere" switch for the courthouse job and delivered it at the courthouse on April 1, 1930.

The superintendent of distribution of the Southern Indiana Gas and Electric testified that he was in the courthouse in "late April or early May of 1930, just after the general wiring was done"; that he had occasion to notice the instrument panel and that he saw the main fused safety service switch on the left side of the panel. And an employee testified that he helped to install the main fused safety service switch "late in March or early in April, 1930," on the "board"; that he helped relocate it "where the service comes in"; and that he thought it was relocated the day before Decoration Day, 1930.

The state completely failed to establish that any switch was required to be furnished under the terms of the supplemental contract or to show that the switch which was furnished and installed had not been furnished and installed in accordance with the terms of the main contract and prior to the time that the allegedly false claim was filed. Since the switch which was installed conforms to the specifications of the main contract it must be presumed that it is the switch which was required by that contract, in the absence of any evidence to the contrary. Not only is there no evidence to the contrary, but the state made no effort to discredit or to contradict the positive evidence of defense witnesses that the switch was furnished and installed in accordance with the main contract and afterward relocated at the point where the state's witnesses found it a year later. There was no conclusive evidence to

explain why the change was made, but the state, on cross-examination of defendant's witnesses, brought out the information that the "400 ampere" switch properly belonged near the point where it was finally placed, since it controlled the entire lighting system of both the courthouse and the jail. Whether the contractor gained any financial advantage under the supplemental contract by reason of the change we cannot say; but even if he did, this did not change the fact that the "400 ampere" switch was furnished and installed under the terms of the first contract and that the claim involved in this prosecution could not have been false as respects the switch.

The trial court, however, permitted the state's expert witnesses to tell the jury that two "400 ampere" switches were required and that no switch was furnished under the terms of the main contract. We cannot assume that the jury did not believe the testimony of these experts; and if their testimony was believed the jury had to conclude that the defendant had approved a claim for a sum of money which was not due and owing under the contract. And, under instruction number one, the jury would have been justified in drawing therefrom an unfavorable inference against the defendant.

Appellant is correct in his contention that the trial court erred in permitting the two electricians to construe the primary and supplemental contracts. It was the province of the jury, under proper instructions of the court, to construe the contracts. As already pointed out, the two electricians told the jury that two "400 ampere" switches were required and that no switch was furnished under the terms of the main contract. If the jury believed this it must have con-

cluded that no "400 ampere" switch had been furnished and installed at the time the claim under the main contract was allowed. It would have been difficult for a juror to have believed that the defendant had made a good faith effort to investigate the claim if the jury was convinced that such an important item as the main service safety switch had not been furnished and installed at the time the claim was filed and approved. The reasonable conclusion must have been that the defendant approved the claim with knowledge that it was false in respect to the amount charged for the switch.

One of the grounds contained in appellant's motion for new trial was "that the court erred in giving to the jury at the request of the plaintiff, the State of Indiana, instruction No. 1 of the instructions requested by the State of Indiana." That instruction is as follows:

"A 'conspiracy' is the corrupt agreeing together of two or more persons to do by concerted acts something unlawful either as a means or as an end.

"The existence of a conspiracy may be proved by circumstantial evidence without showing the existence or terms of a formal agreement among the conspirators."

The instruction defines the common law crime of conspiracy which has not existed in Indiana for years. The gist of our statutory crime, which corresponds to the old common law crime of conspiracy, is an agreement to commit a felony; and a "corrupt agreeing together of two or more persons to do by concerted acts something unlawful either as a means or as an end" might include any number of reprehensible agreements which would not be punishable under our statute.

The proposition contained in the first paragraph of the instruction is substantially the same as was involved in the case of *Kleihege* v. *State* (1934), 206 Ind.

206, 188 N. E. 786, where the jury was instructed as follows (p. 212) :

" 'A conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a purpose, not in itself criminal or unlawful, by criminal or unlawful means.

" 'In order to establish the existence of a conspiracy it is necessary for the state to prove a combination of two or more persons by concert of action to accomplish a criminal or unlawful purpose; and that this defendant was one of this combination.' "

We quote the following from the opinion in the Kleihege case (p. 211) :

"The trial court gave to the jury instructions Nos. 4 and 5, which, in our judgment, were harmfully erroneous, in that these instructions impressed upon the jury the common-law definition of the word 'conspiracy,' thereby modifying or changing our statutory definition of the crime, in this case charged, to the extent that any concerted action by two or more persons to accomplish any criminal or unlawful purpose, or a purpose not unlawful but accomplished by criminal or unlawful means, would make them guilty regardless of the provisions of our statute making only those guilty who enter into a combination to commit a felony."

We are convinced that the "conspiracy" instruction in the instant case could not have been less harmful than those given in the Kleihege case; and on the authority of that case the judgment of the trial court must be reversed.

Appellant contends that the verdict is not sustained by the evidence. We agree that the state's case is obviously weak, but we are not prepared to say that the verdict should not stand if no errors of law had been committed. We must frankly state, however, that we are at a loss to understand the verdict of the jury except on the assumption that the jury accepted the state's erroneous construction of the main and supplemental

contracts and gave effect to the erroneous instructions given by the trial court.

The trial court erred in overruling appellant's motion for a new trial. The judgment is reversed with instructions to sustain appellant's motion for a new trial and for further proceedings not inconsistent with this opinion.